Gregory Haroutunian (SBN 330263)
**EMERY REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825
Telephone: (916) 823-6955
*gregory@emeryreddy.com*

Gregory M. Egleston*
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
*gegleston@gme-law.com*

**pro hac vice* forthcoming

***Attorneys for Plaintiff***

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH FERNICOLA, Derivatively on Behalf of SNOWFLAKE, INC.<br><br>Plaintiff,<br><br>v.<br><br>FRANK SLOOTMAN, MICHAEL P. SCARPELLI, BENOIT DAGEVILLE, SRIDHAR RAMASWAMY, MICHAEL SPEISER, KELLY KRAMER, TERESA BRIGGS, MARK GARRETT, JAYSHREE ULLAL, MARK MCLAUGHLIN, and BILL SCANNELL,<br><br>Defendants,<br><br>and,<br><br>SNOWFLAKE, INC.,<br><br>Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Joseph Fernicola ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Snowflake, Inc., ("Snowflake" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) violations of state and federal law that have caused substantial harm to the Company.

## JURISDICTION

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein under Section 10(b). This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

3. This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the

transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein occurred in this District; and (iv) the Individual Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

6. Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

7. ***Nominal Defendant Snowflake*** was founded in San Mateo, California, where it maintained its corporate headquarters until May 2021, when it announced its status as "a globally distributed workforce and no corporate headquarters." Snowflake is incorporated in Delaware and its principal executive offices are presently located and listed on SEC filings as at 135 Constitution Drive, Menlo Park, CA 94025. The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "SNOW."

### Director Defendants

8. ***Defendant Slootman*** ("Slootman") served as the Company's Chief Executive Officer from April 26, 2019 until February 27, 2024. Slootman has also served as the Chairman of Snowflake's Board of Directors from December 2019 until the present.

9. ***Defendant Benoit Dageville*** ("Dageville") has served as a Company director since August 2012 and is also the Company's Co-Founder. Defendant Dageville also presently serves as

the Company's President of Products and previously was the Company's Chief Technology Officer from 2012 through to 2019.

10. ***Defendant Sridhar Ramaswamy*** ("Ramaswamy") serves as a director of the Company and is also the Company's Chief Executive Officer.

11. ***Defendant Michael Speiser*** ("Speiser") has served as a Company director since July 2012 and as the Company's lead independent director since December 2019. Defendant Speiser also previously served as the Company's part-time CEO and Chief Financial Officer ("CFO") from August 2012 through to June 2014. Defendant Speiser also serves as Chair of the Nominating and Governance Committee and as a member of the Compensation Committee.

12. ***Defendant Kelly Kramer*** ("Kramer") has served as a Company director since January 2020. Defendant Kramer also serves as a member of the Audit Committee

13. ***Defendant Teresa Briggs*** ("Briggs") has served as a Company director since December 2019. Defendant Briggs also serves as a member of the Audit Committee.

14. ***Defendant Mark Garrett*** ("Garrett") has served as a Company director since April 2018. Defendant Garret also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee.

15. ***Defendant Jayshree Ullal*** ("Ullal") has served as a Company director since June 2020. Defendant Ullal is the Chair of the Compensation Committee.

16. ***Defendant Mark McLaughlin*** ("McLaughlin") serves as a director of the Company.

17. ***Defendant Bill Scannell*** ("Scannell") serves as a director of the Company.

18. The above-named defendants are collectively referred to as the "Director Defendants."

**<u>Officer Defendants</u>**

19. ***Defendant Michael P. Scarpelli*** ("Scarpelli") served as the Company's Chief Financial Officer ("CFO") from April 29, 2019 until February 25, 2025, when he announced his retirement.

///

20. Defendant Scarpelli together with Defendants Slootman, Dageville, and Ramaswamy, *supra*, are collectively referred to herein as the "Officer Defendants."

21. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

22. Snowflake is a leading software-as-a-service ("SaaS") provider, specializing in cloud data storage. A customer who generates large amounts of data can use its own computing and storage facilities or can upload their data to a large data bank manager like Snowflake. Many large and small companies find it difficult, expensive, and cumbersome to create their own data storage facilities, as this is not their core business and requires sophisticated expertise and considerable expense. For this reason, Snowflake has been able to sign up thousands of data storage customers. Larger customers are often referred to as "enterprises", and the product they seek must be able to scale rapidly to hold more and different types of data. Such "enterprise storage" is essential, but can be costly.

23. Snowflake was founded to address a growing need for high quality data storage. Many different types of companies require this, and they need the software to be flexible, scalable and cost-effective. In many cases, they cannot handle the task themselves (or they cannot do so entirely). Finally, due to an active hacker "community", customers of such companies expect certain levels of security such that their data is not "breached."

### **Competitive Pressures and New Technology**

24. In connection with its 2020 IPO, Snowflake stated in its Form S-1: "We deliver our platform through a customer-centric, consumption-based business model, only charging customers for the resources they use." This billing methodology was represented to reflect a trend: "We believe that business models are evolving from a fixed capacity, where customers often pay for unused software, to a utility model, where customers pay only for the resources they consume." Nonetheless, there were risks: "There is a risk that customers will consume our platform more

slowly than we expect, and our actual results may differ from our forecasts. Further, investors and securities analysts may not understand how our consumption-based business model differs from a subscription-based business model, and our business model may be compared to subscription-based business models." This model also creates certain tensions with users. Users want to lower bills, while Snowflake desires increased consumption. This requires heavy investment in an aggressive salesforce: "Once a new customer begins using our platform, our sales team will need to continue to focus on expanding consumption with that customer." In addition, new product features, whether based on AI or other emergent technologies, improve efficiency while sometimes reducing usage.

25. Snowflake concealed some of its most prominent usage, billing model and competitive challenges, thus inflating the stock.

26. For example, on the first quarter fiscal 2024 earnings call held on May 24, 2023, a great deal of discussion was held regarding consumption trends. CFO Scarpelli did not attribute consumption issues to competitive pressures, but rather to difficulties customers were facing in their own businesses. He stated, "A few of our largest customers have scrutinized Snowflake costs, as they face headwinds in their own businesses." CEO Slootman echoed this sentiment: "While enthusiasm for Snowflake is high, enterprises are preoccupied with cost in response to their own uncertainties."

27. These statements were misleading. Snowflake was facing challenges, but this could not be laid at the doorstep of the customers or their particular business issues. Rather, Snowflake was being adversely affected by increasing competition, including from open source technologies like Iceberg. In addition, there was increasing pushback against the consumption model itself. Organizations often lacked the sophistication to "optimize" usage and queries, leading to huge bills. Optimizing Snowflake costs requires specialized skills, as users must manage storage, data transfer, and serverless costs separately. Many could not do this, leading to cost overruns and budgeting issues. Thus, the pushback was not wholly due to general businesses problems—rather, the customers had "Snowflake problems." Snowflake, too, was the source of some of the downward consumption trends they were seeing. It was improving the efficiency of its technology to remain

competitive. These issues will be collectively referred to herein as "Consumption Pushback, New Efficiencies and Competitive Pressures." Aggravating these issues was Snowflake's need to aggressively compensate its growing salesforce, and customer demands for discounts.

28. In terms of specific competitive pressures, the emergence of Iceberg cannot be understated. Iceberg was originally developed by Netflix. In 2018, Netflix donated Iceberg to the Apache Software Foundation, making it an open-source project. This meant that the product, sometimes referred to as Apache Iceberg, could be used by any company, and these users were free to refine it, modify it, and improve it. Snowflake created its own Iceberg-centered versions and various Iceberg applications, but these needed to compete with sometimes cheaper or more efficient Iceberg-based applications. One article, on January 5, 2023, quoted tech forecaster Haoyuan Li as predicting that formats such as Iceberg would, in 2023, be "rapidly adopted." This turned out to be an accurate assessment.

29. Some perceived CEO Slootman as being not up to the challenge of these new technologies, which not only included Iceberg, but also AI applications. Slootman's confidence and active engagement in the business was highly material to investors. In mid2023 rumors surfaced that Slootman would soon retire. On June 26, 2023 Business Insider published an article regarding this matter, wherein it reported:

> Snowflake CEO Frank Slootman tells Insider that ongoing rumors that he could soon step down are completely untrue. Insider heard rumors of Slootman's departure from multiple industry sources, and reached out to ask Slootman if he was leaving soon. "You are wrong on all counts. You are regurgitating competitive FUD," Slootman told us in his famously direct, nononsense style. FUD, or fear-uncertainty-doubt, is a favorite old-school tech acronym.

30. In actuality, Slootman was contemplating retirement, and the Board was about this time or shortly thereafter engaged in a CEO search, with heavy focus on Sridhar Ramaswamy, Snowflake's Senior Vice President of AI and a former Google executive. Ramaswamy joined Snowflake in 2023 via the acquisition of his AI-powered search company, Neeva. Slootman, upon his retirement a few months later, described Ramaswamy as a needed "hard-driving technologist."

31. In the meantime, while Snowflake's business issues were being concealed, Slootman established a Rule 10b5-1 sales plan on September 25, 2023 which would supercharge his personal stock sales in the weeks prior to both his surprise retirement and the negative revelations concerning Snowflake's Consumption Pushback, New Efficiencies and Competitive Pressures disclosed in early 2024. Under his new plan, Slootman sold approximately $223 million worth of Snowflake stock in only 46 days, including a $50 million sale made only 19 days before his retirement announcement.

32. Another earnings conference call was held on August 23, 2023. On that call, CEO Slootman barely mentioned Iceberg, and falsely painted it as an unmitigated positive for Snowflake:

> With our support of Iceberg Tables, we are expanding our data lake scope. Many customers already use Snowflake as a data lake. Large financial services customer consolidates data in Snowflake to eliminate useless extract and transfers of data. This means new use cases are deployed 80% faster. Iceberg Tables will bring additional scope in open file formats to Snowflake. We expect to unlock more data lake opportunities with these capabilities.

33. CFO Scarpelli added on that same call:

> …consumption is good. It was really good today as an example. But it's only one data point. We want to see more days of that before we think the -- we're into a real recovery. I think stabilization is the right term. We're not seeing customers reduce their consumption right now.

34. In fact, however, Snowflake was under pressure from Consumption Pushback, New Efficiencies and Competitive Pressures, rendering these statements materially omissive and misleading.

35. On November 29, 2023, during a conference call with investors and analysts after the disclosure of Snowflake's financial results, Defendant Scarpelli stated the following regarding consumption:

> In Q3, we saw strong consumption from a broad base of customers. Our performance was evenly split between large and small accounts. Our largest customer stabilized as expected. Migrations drove growth in Q3. Our 2 fastest growing customers who are both migrating workloads from a legacy vendor. One of these accounts is in their second year on the platform, the other in their eighth year on the platform. We added 4 customers with more than $5 million and 2 customers with more than $10 million in trailing 12- month product revenue in the quarter.

36. In fact, however, Snowflake was under pressure from Consumption Pushback, New Efficiencies and Competitive Pressures, rendering these statements materially omissive and misleading.

**Consumption Pushback, New Efficiencies, and Competitive Pressures are Revealed**

37. On February 28, 2024, after the market closed, Snowflake issued a press release and filed a report with the SEC on Form 8-K that disclosed its financial results for the fourth fiscal quarter and full year 2024, provided guidance, and conducted a conference call with investors and analysts. The Individual Defendants shocked investors by disclosing that consumption trends and anticipated revenue headwinds associated with product efficiency gains, Iceberg Tables, and tiered storage pricing had impacted their guidance.

38. On the February 28, 2024 conference call with investors and analysts, Defendant Scarpelli revealed that "[c]onsumption trends have improved since the ending of last year, but have not returned to pre-FY '24 patterns. We have evolved our forecasting process to be more receptive to recent trends. For that reason, our guidance assumes similar customer behavior to fiscal 2024. We are forecasting increased revenue headwinds associated with product efficiency gains, tiered storage pricing and the expectation that some of our customers will leverage Iceberg Tables for their storage."

39. On the same call, Scarpelli further stated that "[t]hese changes in our assumptions impact our long-term guidance" and provided full fiscal year 2025 product revenue guidance of approximately $3.25 billion, representing 22% year-over-year growth.

40. As a result, the Individual Defendants also withdrew their long-standing $10 billion 2029 product revenue target and lowered FY '25 guidance to 22% year-over-year growth, drastically below the market's expectation of 30%: Scarpelli said: "These changes in our assumptions impact our long-term guidance. Internally, we continue to march towards $10 billion in product revenue. Externally, we will not manage expectations to our previous targets until we have more data. We are focused on executing in FY '24 to ensure long-term durable growth."

41. On that same day, Defendant Scarpelli further described the expected headwinds and admitted that they had already begun to see the impacts as early as Q4 2024 (which was mainly in the final months of calendar year 2023):

> It's about a 6.2%, 6.3% impact this year [from product efficiency gains]. And – but coupled with that, too, in the revenue, we rolled out in Q4 tiered storage pricing. So the amount of revenue associated with storage is coming down. But on top of that, we do expect a number of our large customers are going to adopt Iceberg formats and move their data out of Snowflake where we lose that storage revenue and also the compute revenue associated with moving that data into Snowflake. We do expect, though, there'll be more workloads that will move to us, but until we see that incremental revenue on workloads, we're not going to forecast that. I will say, last year, we saw a 62% increase in the number of jobs running on Snowflake year-over-year with a corresponding 33% increase in revenue. And that's because we continue to show our customers that we become cheaper and cheaper to them every year. And when we do that, it opens up new workload opportunities for us, and we'll continue to do that.

42. Scarpelli further admitted: "A lot of big customers want to have open file formats to give them the options. And by the way, this is not necessarily customers moving all of their storage out of Snowflake, but a lot of the growth in their storage will be put into Iceberg Tables is what we think is going to happen. So you're just not going to see the growth associated with the storage and many of those customers. As a reminder, about 10% to 11% of our overall revenue is associated with storage."

43. On February 28, 2024, after the market closed, Snowflake also issued a press release and filed a report with the SEC on Form 8-K that disclosed that effective February 27, 2024, Frank Slootman retired as Chief Executive Officer of Snowflake Inc.

44. On March 5, 2024, Scarpelli admitted at a presentation: "I do think some of our larger customers, because they've told us they want to, will move to open-file formats in Iceberg. That will take storage out of Snowflake."

45. Shockingly, CEO Slootman interjected:

> Now, on the topic of CEO transition. I was brought to Snowflake five years ago to help the company breakout and scale. I wanted to grow the business fast, but not at all costs. It had to be efficient and establish a foundation for long-term growth. I believe the company succeeded on that mission.

> The Board has run a succession process that wasn't based on arbitrary timeline, but instead, looked for an opportunity to advance the company's mission, well into the future. The arrival of Sridhar Ramaswamy through the acquisition of Neeva last year represented that opportunity.
>
> Since joining us, Sridhar has been leading Snowflake's AI strategies, bringing new products and features to market at an incredible pace. He led the launch of Snowflake's Cortex, Snowflake's new fully-managed service that makes AI simple and secure. Prior to Neeva, Sridhar lead all of Google's advertising products. During his 15-year tenure at Google, he helped grow AdWords and Google's advertising business from $1.5 billion to over $100 billion.
>
> With the onslaught of generative AI, Snowflake needs a hard-driving technologist to navigate the challenges the new world represents. Sridhar's vision for the future and his proven ability to execute at scale made it clear to us as a Board, he is the right executive at the right time to lead Snowflake.
>
> This marks my retirement from an operating role. I will remain on duty as Chairman of the Board, and look forward to working with Sridhar and the team going forward.

46. But this was not the end of the surprising news. Projections made that day were soon revised, as they had unreasonably and recklessly overlooked necessary expenses related to AI improvements and other costs. On a May 22, 2024 earnings call, CFO Scarpelli revealed:

> For Q2, we expect product revenue between $805 million and $810 million, we are increasing our FY '25 product revenue guidance. We now expect full year product revenue of approximately $3.3 billion, representing 24% year-over-year growth. Turning to margins. We are lowering our full year margin guidance in light of increased GPU-related costs related to our AI initiatives. We are operating in a rapidly evolving market, and we view these investments as key to unlocking additional revenue opportunities in the future. As a reminder, we have GPU related costs in both cost of revenue and R&D. We announced our intent to acquire certain technology assets and hire key employees from TruEra. TruEra is an AI observability platform that provides capabilities to evaluate and monitor large language model apps and machine learning models and production. We are excited to welcome approximately 35 employees from TruEra to Snowflake, the impact of the transaction is reflected in our outlook. For Q2, we expect 3% non-GAAP operating margin. For FY '25, we expect 75% non-GAAP product gross margin, 3% non-GAAP operating margin and 26% non-GAAP adjusted free cash flow margin.

47. Thus, the bad news was spread out between two earnings releases so as to "soften the blow." In Q1 2025, the sum of S&GA and R&A increased by 31.61%, placing EBIT in negative territory, increasing from -$273 million in 2024 to -$348.5 million in the 2024 first fiscal quarter. Consequently, even on an adjusted basis, SNOW's EPS did not show the improvement that the market had hoped for. SNOW missed its EPS estimate by more than 19%. On May 23, 2024,

Snowflake stock dropped on higher than normal volume from $163.34 to 156.16. There was yet more bad news to come.

**Hackers Exploit a Concealed Security Flaw**

48. Data breaches have affected software companies for many years. Companies like Snowflake can deter the vast majority of data breaches by adopting strong security measures, in partnership with their customers.

49. Indeed, it seemed in early 2023, that this is what Snowflake was doing. In its Form 10-K filed on March 29, 2023 at p. 12, Snowflake assured investors that its services promoted strong cybersecurity:

> **Cybersecurity**.
>
> Our platform helps eliminate data silos, which can enable robust analytics and better security outcomes. For Cybersecurity, our platform enables organizations to:
>
> • Accelerate security analytics. Unify logs, enterprise data, and contextual data sets to achieve better fidelity and automation.
>
> • Leverage customized resources. Access dynamically updated threat intelligence from our Marketplace and a wide network of connected applications that provide out-of-the-box integrations, content, and visualizations to enable initiatives such as threat detection and response.

50. Snowflake expanded on this topic on its website's blog. In a September 12, 2023 post entitled, "Understanding Snowflake's Shared Responsibility Model", the Company said as follows:

> **What is the Snowflake Shared Responsibility Model?**
>
> It helps establish a clear understanding of who is responsible for which security controls and practices to ensure a collaborative, yet accountable, approach to security.
>
> With the Shared Responsibility Model, our users can now have a more comprehensive view of their security obligations as well as the measures we, at Snowflake, have implemented to protect user data. This model fosters transparency and empowers our users to actively participate in securing their Snowflake deployments. Our guiding principle is to minimize the customer's obligations under the model and assume a majority of the responsibilities through automation and feature availability within Snowflake's product offering. This is clear from the size of the customer side of our model compared to other vendors in the market.

51. This representation was untrue. In fact, Snowflake devoted minimal energy to protecting customer data, and placed the vast majority of the responsibility onto its customers, who were ill-prepared to assume that responsibility, or to overcome impediments created by Snowflake.

52. The electronic storage industry was shaken by a series of data breaches in 2023, in record-setting numbers. The 3,205 data breaches in 2023 represented a 78% increase over the number in 2022. The Individual Defendants knew that major data breach affecting Snowflake would be harmful to the Company and its stockholders. They also knew that a major deterrent to a breach was "multi-factor authentication" or "MFA" system (this is a system whereby a person signing on to a system enters a password plus does one or more other things to prove identity, such as entering a code received via text message). However, Snowflake's system architecture set up roadblocks: MFA was turned off by default, and systems administrators could not impose the safety measure (in industry terms could not "enforce" it).

53. In discussing Snowflake's risks and systems, Snowflake and the Individual Defendants created a misimpression that customers were handling access security, when in fact they had not been able to do so.

54. Snowflake's awareness of its customers' vulnerabilities can be inferred from a drastic shift in how it described its Shared Responsibility Model in early 2024. In its Form 10- K filed on March 26, 2024, at p. 47, the Individual Defendants said:

> Our security teams work with management to prioritize our risk management processes and mitigate cybersecurity threats, including those that may materially impact our business. Our assessment and management of material risks from cybersecurity threats is a key risk area within our enterprise risk management program. Our Chief Information and Data Officer, Chief Information Security Officer, and EVP, Engineering are responsible for management of cybersecurity risk under our enterprise risk management program, and senior management and the audit committee of our board of directors receive reports on the key risks and the effectiveness of our management of such enterprise risks. In addition, key cybersecurity risks are assessed as part of our internal audit program. We have completed various security audits and certifications, including SOC 2 Type II, SOC 1 Type II, PCIDSS, HITRUST, FedRAMP High, and ISO/IEC 27001. We also employ a shared responsibility model where our customers are responsible for using and configuring our platform in a manner that meets applicable cybersecurity standards. As part of this shared security model, customers have sole responsibility for creating and securing their access credentials for our platform.

55. What the Individual Defendants knew, but didn't disclose in that Form 10-K, was that prominent customers had proved unable to manage security for access credentials, and were unable to navigate Snowflake's customer-unfriendly tools which included multi-factor authentication (the gold standard of user protection) being turned off by default, rendering system administrators unable to "enforce" compliance with security measures at the user level. Having addressed this issue, the Individual Defendants had a duty to do so frankly, fully, and honestly. Instead, they concealed that they had created a situation in which major users were at high risk of a data breach, a scenario which would also harm Snowflake and its investors.

56. Best practices in Snowflake's industry are set forth by CISA. On its website, CISA states: "CISA provides information on cybersecurity best practices to help individuals and organizations implement preventative measures and manage cyber risks." In its 2023 white papers, although CISA did not mention Snowflake by name as its internal practices were not yet known, it did describe practices essentially identical to what Snowflake was doing (or not doing). Its October 2023 white paper, which contained an overview section captioned "Vulnerable By Design", CISA declared that resting cybersecurity on the shoulders of the customers was "untenable." Security risk was such a difficult and specialized issue, CISA noted, that even many IT professionals could not adequately comprehend what was required. Thus, "Applications should be made with clear indicators about the potential risks that may result from [product] settings and should make those indicators known." White Paper, at 13. Many customers were, CISA found, "generally unable to facilitate" what was needed to maintain security—*i.e.*, to "to research, fund, purchase, staff, deploy, and monitor additional security products to reduce the chance of compromise." *Id.* The Individual Defendants knew this, but said nothing about it in its discussion of cybersecurity risks. Indeed, this knowledge motivated the shift in its Form 10-K language so as to set the table for "blaming the customer" when the inevitable wide-scale security breach occurred.

57. Avoiding best practices also enabled Snowflake to escape the extra time, and expense that implementing and updating proper security measures would have entailed.

58. On May 23, 2024, Snowflake stock dropped on higher-than-normal volume from $163.34 to 156.16.

59. In addition, at this same time, a data breach affecting major Snowflake customers was beginning to become known. As news came out bit-by-bit, Snowflake's shares dropped.

60. On May 22, 2024, cybersecurity watchdog Mandiant notified Snowflake and law enforcement of an ongoing hacker campaign focusing on Snowflake customers. On May 30, 2024, Snowflake reported: "We became aware of potentially unauthorized access to certain customer accounts on May 23, 2024." In the following days, several major customers confirmed they had been hacked. Finally, on June 10, 2024, Mandiant reported that as many as 165 companies had been affected, including household names such as Ticketmaster, AT&T, Santander Group, Advance Auto Parts, Lending Tree and Neiman Marcus.

61. Snowflake scrambled to address the issues and refine its architecture. (In the ensuing multidistrict federal litigation, Snowflake's arguments that it lacked a duty to protect customers against this breach were rejected).

62. By June 10, 2024, Snowflake stock had fallen to $126.76 on high trading volume, with breach-related disclosures largely responsible for driving the price down as revelations jolted the market little by little, eroding the stock price from its initial value of $154.58 on May 23, 2024. These price drops represented the materialization of an undisclosed risk that flowed from Snowflake's concealment of the degree of vulnerability and lack of precautions prevailing at major Snowflake customers. Instead of frankly disclosing customers' severe lack of preparedness when it raised the issue of customer security, the Individual Defendants misleadingly downplayed the matter by simply stating the customers were (in its view) solely responsible for access security. Snowflake did not reveal that major customers were unable to handle that responsibility, or that its system settings impeded implementation of important security measures. Snowflake has since conceded that, as to security issues, the company and its customers have a "shared destiny." It has also worked to drastically upgrade security.

63. One tech security specialist, Dr. Frank Wang, noted in the wake of the breach that

even if Snowflake was not 100% responsible, "compared to other software, Snowflake does have a worse product security experience," which makes it "hard" to implement proper security. This difficulty resulted in a serious security risk, as the Individual Defendants knew customers had not adopted adequate security measures. Additionally, an article in Cybersecuritydive.com noted: "Snowflake's approach to MFA bears inherent limits for its IT administrators. An instance of Cisco Duo that is managed by Snowflake is the only MFA solution available to its customers, and the company doesn't allow administrators to enforce MFA for a specific role, according to the company's MFA support page." Ofer Maor, co-founder and CTO at Mitiga, stated that Snowflake was out of step with the industry: "While other vendors may also offer the ability to start without MFA, most SaaS vendors, once deployed as an enterprise solution, allow administrators to enforce MFA."

64. The data breach affected at least 165 customers. These included:

- AT&T – Over 50 billion call records and other customer data exposed.
- Ticketmaster / Live Nation Entertainment – Unauthorized activity detected in a third-party cloud database environment. Up to 530 million customers compromised.
- Santander Group – Data from Santander Chile, Spain, Uruguay, and some former employees accessed. Up to 30 million customer records, including account balances and transaction histories.
- Advance Auto Parts – Customer data compromised.
- LendingTree. Financial and personal data exposed
- Neiman Marcus – Customer records stolen involving 70 million transaction records containing gift card data and customer IP addresses.
- Bausch Health – Health and financial data affected.

65. In the ensuing federal litigation, the MDL Court ruled: "It can be inferred that this [customer] failure to implement MFA arose from Snowflake's failure to enforce its standards." *In re Snowflake, Inc.*, No. 2:24-MD-03126-BMM, 2025 LEXIS 472160, at *23 (D. Mont. Oct. 29, 2025). In addition, Snowflake failed "to protect customer data from foreseeable risk of harm by providing additional security measures…" *Id.* at *22. Given the highly publicized and frequent data

breaches, this topic would have been a focus of the Individual Defendants, and they would have known of these deficiencies, and did know of them.

66. In sum, the Individual Defendants knew that "Shared Responsibility" was an abject failure, creating an extreme vulnerability, and a high risk of data breaches. Yet they discussed the program in either positive or neutral terms designed to set off no alarm bells, and to leave investors in a state of ignorance. In doing so, they violated the federal securities laws.

## SHARE REPURCHASES

67. According to the Company's SEC filings, the Director Defendants authorized a share repurchase program for the Company to repurchase up to $2 billion of its common stock. While the Company's share price was artificially inflated as a result of the misconduct alleged herein, the Individual Defendants caused the Company to repurchase its own common stock, causing harm to the Company, as follows:

| Date | Number of Shares Repurchased | Average Price per Share ($) | Total Paid ($) | Total Overpayment ($)[1] |
|---|---|---|---|---|
| August 2023 | 28 | 152.33 | 4,265.24 | 3,549.28 |
| September 2023 | 1,909 | 154.96 | 295,818.64 | 241,984.84 |
| October 2023 | 670 | 149.35 | 100,064.50 | 84,929.20 |
| May 2024 | 2,982 | 173.14 | 516,303.48 | 377,998.32 |
| **TOTAL** | **3,394,178** | **--** | **916,452** | **207,990** |

68. Because the Company's common stock was actually worth $126.76 (*i.e.*, the price it was following the full extent of the data breach being revealed), the Company should have paid $708,462 for its repurchases. Instead, the Individual Defendants caused the Company to make these harmful repurchases at artificially inflated prices, causing the Company to overpay for its own common stock by approximately $207,990.

[1] "Total Overpayment" refers to the amount the Company overpaid for its common stock and is calculated by subtracting what the Company should have paid for its stock at its true price of $126.76 per share, as it was when the truth was fully revealed, from what the Company actually paid for its common stock at artificially inflated prices, *i.e.*, the "Total Paid ($)".

## DAMAGE TO THE COMPANY

**Securities Class Action**

69. On May 22, 2026, a securities class action complaint was filed in the United States District Court for the Northern District of California against the Company and the Defendants Slootman and Scarpelli. The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 in the case captioned: *Smith v. Snowflake, Inc., et al.*, Case No. 3:26-cv-04869 (N.D. Cal.) ("Securities Class Action").

70. As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's officers. The Company will continue to incur significant sums in relation to the Securities Class Action and any liability or settlement that results.

**Share Repurchases**

71. As alleged above, the Individual Defendants caused the Company to repurchase its own common stock while it was trading at artificially inflated prices. As a result, the Individual Defendants caused the Company to overpay by more than $207,000.

**Unjust Compensation**

72. At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

73. Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner. Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

74. However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein. Because the Individual Defendants failed to carry out their respective duties, the compensation they received was excessive and undeserved. As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

75. As a direct and proximate result of the Individual Defendants' conduct, the Company will lose and expend many millions of dollars.

76. Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein.

77. As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## CORPORATE GOVERNANCE

78. Board members are held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

79. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Snowflake, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

80. At all relevant times, the Company had in place its Global Code of Conduct and Ethics ("Code of Conduct") which "applies to all employees, members of Snowflake Inc.'s Board of Directors […], contractors, and other contingent workers of Snowflake Inc." The Code of

Conduct provides that it "is your guide for upholding Snowflake's values in your day-to-day activities."

81. From the outset, the Code of Conduct outlines the Company's values:



OUR VALUES

**Put Customers First**

We only succeed when our customers succeed. Work every day to earn our customers' business and trust. Listen to our customers, understand their needs and pain points, and focus on what matters to them. Deliver products our customers love. Compete fairly and passionately.

**Integrity Always**

Be open, honest and respectful. Speak up and communicate candidly, even when it makes you uncomfortable or may be something others don't want to hear. Constructive, respectful disagreement and debate encourages better problem-solving and decisions. Commit fully when decisions are made.

**Think Big**

Be ambitious and have big goals. Do what matters and focus on what's important. Innovate and be willing to take prudent risks. Make a positive impact and a lasting difference. Plan to win, play to win and expect to win.

**Be Excellent**

Quality and excellence count in everything we do. Do your best work every day. Hold yourself and others to the highest standards. Common sense, creativity, practicality and simplicity matter. Think strategically, balancing today and tomorrow.

**Get It Done**

Results matter! Work hard and smart. Execute. Be precise and accountable, yet nimble and agile. Make commitments, follow through and deliver.

**Own It**

Build our product and our company like it's yours, because it is. Hold yourself and others accountable at all times. Take initiative and ownership. Be responsible. Step up, own issues and resolve them. If you make a mistake, own it, fix it, learn from it and move on.

**Make Each Other The Best**

Treat people with kindness and respect. Be inclusive and collaborative, bringing people and ideas together. Offer help and ask for help when needed. Listen. Give and ask for constructive feedback. Give praise and celebrate success. Teach and learn every day. Give back to our communities in meaningful ways and inspire others with your actions.

**Embrace Each Other's Differences**

Accept and appreciate everyone from every walk of life. Be conscious and mindful that others may have a different experience from your own. Use our differences to strengthen who we are.

82. In a section entitled "Compliance with Law," the Code of Conduct states:

> Snowflake takes its obligation to follow the law very seriously. You should proactively make sure that you understand the laws and regulations that apply to your work. Each of us is personally responsible for complying with all applicable legal requirements and prohibitions. If you are doing business outside of the U.S., you must comply with applicable U.S. and local laws. You may not do business with a third party on behalf of Snowflake if you know or should know that it engages in illegal activities. If this Code or any other Snowflake policy conflicts with law, follow the law. Ask the Legal team if you have any questions or comments about the correct course of action

83. With respect to "Financial Records," the Code of Conduct states:

> We are required to follow strict accounting principles and standards, to maintain financial information accurately and completely, and to have appropriate internal controls and procedures to ensure that our accounting and financial reporting complies with law. Snowflake's financial and other disclosures must be full, fair, accurate, timely, and understandable.
>
> Compliance with Rules, Controls, and Procedures
>
> All transactions must be properly recorded, classified, and summarized in our financial statements, books, and records in accordance with our policies, controls, and procedures, as well as all generally accepted accounting principles, standards, laws, rules, and regulations for accounting and financial reporting (together, "Accounting Rules"). If you have responsibility for or any involvement in preparing financial or accounting records, you must understand and follow the relevant Accounting Rules. If you are a VP or higher, you must ensure that appropriate internal controls and procedures in your business area are in place, understood, and followed.
>
> Accuracy of Records and Reports
>
> Snowflake relies on records and reports to have complete, accurate, and timely information to make good decisions. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must make sure that those records and reports are complete, accurate, and timely. Anyone representing or certifying that records and reports are accurate should first make an inquiry or review adequate to establish a good faith belief in their accuracy.
>
> Even if you are not directly involved in financial reporting or accounting, you are probably involved with financial records or reports of some kind—a certification voucher, timesheet, invoice, or expense report. In addition, most employees have involvement with product, marketing, or administrative activities, or performance evaluations, which can affect financial condition or results that we may share from time to time. Therefore, Snowflake expects everyone to make sure that business records and reports are accurate, complete, and reliable.
>
> […]
>
> Intentional Misconduct
>
> You may not intentionally misrepresent Snowflake's financial performance or otherwise intentionally compromise the integrity of Snowflake's reports, records, policies, or procedures. […]

**<u>Audit Committee Charter</u>**

84. At all relevant times, the Company had in place its Audit Committee Charter which sets forth additional duties and responsibilities for the members of the Audit Committee. The Audit Committee Charter provides that the Audit Committee be to monitor and advise the Board on: (i)

the Company's corporate accounting and financial reporting processes, systems of internal control and financial-statement audits, and the integrity and quality of the Company's financial statements; (ii) review any Company reports or disclosures about financial or accounting information required by the applicable rules and regulations of the SEC and the rules, regulations, and requirements of the stock exchange that lists the Company's stock, taking into account any exceptions permitted by such stock exchange; (iii) the organization and performance of the Company's internal audit function; (iv) the Company's legal and regulatory compliance, including risk assessment; and (v) provide regular reports and information to the Board with respect to material issues.

85. The Audit Committee Charter sets forth the following responsibilities of the Audit Committee:

> [] The Committee will review the annual audited financial statements, the quarterly financial statements, and the Company's "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors," as appropriate, with management and the Auditor. The Committee will be responsible for recommending to the Board whether the proposed annual audited financial statements should be included in the Company's Annual Report on Form 10-K
>
> [] The Committee will review and discuss with management and the Auditor, as appropriate, any earnings press releases and other financial information and guidance regarding the Company's results of operations provided publicly or to ratings agencies. As part of this discussion, the Committee shall review any use of "pro forma," "adjusted," or non-GAAP information and any other financial information and earnings guidance provided to analysts and/or rating agencies. The Chair may represent the entire Committee for the purposes of this discussion.
>
> [] The Committee will review and discuss with management and the Auditor the Company's processes and policies on risk identification, management, and assessment in all areas of the Company's business […].
>
> [] The Committee will confer with management and the Auditor concerning the scope, design, adequacy, and effectiveness of internal control over financial reporting and the Company's disclosure controls and procedures, including (i) the Company's processes and controls surrounding the compilation and reporting of any "pro forma," "adjusted," or non-GAAP information included in quarterly earnings releases or SEC filings and (ii) any significant deficiencies or significant changes in internal controls. The Committee will review reports on significant findings and recommendations with respect to internal controls over financial reporting, together with management responses and any special audit steps adopted in light of any material control deficiencies.
>
> [] The Committee will review management's disclosure to the Committee and the independent auditor under Section 302 of the Sarbanes-Oxley Act, including identified changes in internal control over financial reporting.

> [] The Committee will review the results of management's efforts to monitor compliance with the Company's programs and policies adhering to applicable laws and rules, including the Company's code of conduct. […].
>
> [] The Committee will perform such other functions and have such other powers as may be necessary or appropriate in complying with applicable law, rules, regulations, or this Charter.

**DUTIES OF THE DIRECTOR DEFENDANTS**

86. As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

87. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

88. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were, and are, required to act in furtherance of the best interests of the Company and its investors.

89. Each Director Defendant owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

90. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d) remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f) ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

91. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise

of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

92. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## <u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

93. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

94. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

95. Plaintiff is a current owner of the Company's common stock and has continuously been an owner of the Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

96. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

97. At the time this suit was filed, the Company's Board was comprised of ten (10) members: the Director Defendants. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgement about whether to bring this action or whether to vigorously prosecute this action.

98. The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

**THE DIRECTOR DEFENDANTS ARE**
**NOT INDEPENDENT OR DISINTERESTED**

99. Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

100. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

101. Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent

manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

102. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

103. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

104. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

105. The Director Defendants solicited the false and misleading 2023 Proxy Statement, which led to Defendants Boone and Marcario being re-elected to the Board, allowing them to continue breaching their fiduciary duties to the Company. Thus, not only do the Director Defendants face a substantial likelihood of liability for the false and misleading proxy statement, but Defendants Boone and Marcario also received a material personal benefit thereby.

106. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

107. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for the Company for any of the misconduct alleged herein.

**Defendant Dageville**

108. Defendant Dageville is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its President of Products and Co-Founder) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Dageville cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

109. As a co-founder, Defendant Dageville is inherently and irreconcilably conflicted as he could not consider a demand to sue the officers and directors of the Company that he created, which could have an adverse impact on both the Company and his ongoing employment.

110. In addition, Defendant Dageville receives lucrative compensation in connection with his employment with the Company. Defendant Dageville is not independent from the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Dageville. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Dageville could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

**Defendant Slootman**

111. Defendant Slootman is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its former CEO) was an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Slootman cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company.

112. As former CEO, Defendant Slootman also fails the NYSE's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Slootman could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Slootman is therefore futile.

113. In addition, Defendant Slootman received lucrative compensation in connection with his employment with the Company. As such, Defendant Slootman is not independent from the Compensation Committee who are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Slootman. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he received, Defendant Slootman could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

**Defendant Ramaswamy**

114. Defendant Ramaswamy is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent. As such, Defendant Ramaswamy cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

115. As CEO, Defendant Ramaswamy also fails the stock exchange bright-line independence test and cannot, therefore, be considered independent, as admitted by the Company in its 2025 Proxy Statement. As such, Defendant Ramaswamy could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Ramaswamy is therefore futile.

116. In addition, Defendant Ramaswamy receives lucrative compensation in connection with his employment with the Company. Defendant Ramaswamy is not independent from the

directors on the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Ramaswamy. The purpose of the Human Resources Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and executive officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Ramaswamy could not consider a demand adverse to the other Director Defendants serving on the Human Resources Committee who are responsible for his financial future.

117. Because of Defendant Ramaswamy's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Ramaswamy is unable to comply with his fiduciary duties and prosecute this action. Defendant Ramaswamy is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendants Kramer and Garrett**

118. Defendants Kramer and Garrett have a longstanding professional relationship with each other, stemming from at least 2018. Defendant Kramer served as CFO of Cisco from 2012 through to 2020. At the same time, Defendant Garrett served as a director of Cisco from 2018 through the present. As a result of this longstanding business relationship, Defendants Kramer and Garrett are each indebted to one another and are thus incapable of impartially considering a demand to sue each other for the wrongdoing alleged herein.

**Defendants Kramer, Garrett, and Briggs**

119. Defendants Kramer, Garrett, and Briggs served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein

120. Defendants Kramer, Garrett, and Briggs breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and

misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Kramer, Garrett, and Briggs face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Excused**

121. The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

122. The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

123. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

124. The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

125. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

126. Publicly traded companies, such as Snowflake, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

127. Accordingly, each of the Director Defendants, and at least a majority of the Director Defendants, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

**FIRST CAUSE OF ACTION**
**(Against the Individual Defendants for Breach of Fiduciary Duties)**

128. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

129. The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

130. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

131. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith as detailed herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

132. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

133. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**
**(Against the Individual Defendants for Gross Mismanagement)**

134. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

135. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

136. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

137. Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**
**(Against the Individual Defendants for Waste of Corporate Assets)**

138. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

139. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going. It resulted in continuous, connected, and ongoing harm to the Company.

140. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

141. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**FOURTH CAUSE OF ACTION**
**(Against the Individual Defendants for Unjust Enrichment)**

142. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

143. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

144. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

145. Plaintiff, as a shareholder and representative of the Company, seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**
**(Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act)**

146. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein, except for the causes of action.

147. The Individual Defendants disseminated and/or approved public statements that failed to disclose the above-referenced truthful facts and, as a result of the foregoing, the Individual Defendants' public statements were materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused the Company to repurchase millions of shares of Company stock, thereby causing significant financial harm to the Company.

148. As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Snowflake, their control over, and/or receipt

and/or modification of Snowflake's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Snowflake, participated in the fraudulent scheme alleged herein.

149. The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

150. The Individual Defendants were each members of Snowflake's Board and senior management team during the aforesaid time period. Based on their roles at Snowflake, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

151. At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at Snowflake, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements.

152. Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

153. As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154. As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. Declaring that Plaintiff may maintain this action on behalf of the Company and that Plaintiff is an adequate representative of the Company;

B. Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Exchange Act;

C. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein, including but not limited to removing and replacing its officers and directors.

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: June 29, 2026

/s/ Gregory Haroutunian
Gregory Haroutunian (SBN 330263)
**EMERY REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825
Telephone: (916) 823-6955
gregory@emeryreddy.com

Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
gegleston@gme-law.com

***Attorneys for Plaintiff***

**VERIFICATION**

I, JOSEPH FERNICOLA, declare that I have reviewed the verified shareholder derivative complaint ("Complaint") prepared on behalf of Snowflake, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Snowflake, Inc. common stock at all relevant times.

Joseph Fernicola
JOSEPH FERNICOLA